August 17, 1994
United States Court of Appeals
For the First Circuit

No. 93-2296

JIMMIE E. WOODS,

Plaintiff, Appellant,

v.

FRICTION MATERIALS, INC.,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Mark L. Wolf, U.S. District Judge]

Before

Breyer,* Chief Judge,

Boudin and Stahl, Circuit Judges.

ERRATA SHEET

The following references to "Mass. Gen. L. ch. 93A" should be
changed to "Mass. Gen. L. ch. 93":

Page 5, first full , l. 9
Page 6, l.10
Page 8, l.11
Page 20, l.5, l.7, l.17

*Chief Judge Stephen Breyer heard oral argument in this matter but did
not participate in the drafting or the issuance of the panel's
opinion. The remaining two panelists therefore issue this opinion
pursuant to 28 U.S.C. 46(d).

August 4, 1994 UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

No. 93-2296

JIMMIE E. WOODS,

Plaintiff, Appellant,

v.

FRICTION MATERIALS, INC.,

Defendant, Appellee.

ERRATA SHEET

The opinion of this court issued on July 29, 1994, is amended as

follows:

Page 15, second line from the bottom of the page: Delete "the"

after "than."

United States Court of Appeals

For the First Circuit

No. 93-2296

JIMMIE E. WOODS,

Plaintiff, Appellant,

v.

FRICTION MATERIALS, INC.,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Mark L. Wolf, U.S. District Judge]

Before

Breyer,* Chief Judge,

Boudin and Stahl, Circuit Judges.

Frederick T. Golder with whom Bernstein, Golder & Miller P.A. was

on brief for appellant.

Samuel A. Marcosson, James R. Neely, Jr., Gwendolyn Young Reams,

and Vincent J. Blackwood were on brief for Equal Employment

Opportunity Commission, amicus curiae.

Dan T. Carter with whom James Allan Smith, Smith, Currie &

Hancock, Richard W. Gleeson, and Gleeson & Corcoran were on brief for

appellee.

July 29, 1994

*Chief Judge Stephen Breyer heard oral argument in this matter but did

not participate in the drafting or the issuance of the panel's

opinion. The remaining two panelists therefore issue this opinion

pursuant to 28 U.S.C. 46(d).

STAHL, Circuit Judge. Plaintiff Jimmie E. Woods

filed a complaint charging defendant Friction Materials Inc.

("FMI") with illegal race, age, and handicap discrimination

in violation of state and federal law. Woods now appeals the

district court grant of summary judgment in favor of FMI. We

affirm.

I.

FACTUAL FINDINGS AND PRIOR PROCEEDINGS

Woods, a 54 year-old, handicapped, African-American

male, was employed between 1961 and 1986 by PT/BT, a small

group of interrelated brake manufacturing companies in

Lawrence, Massachusetts. During his tenure with PT/BT, Woods

was promoted twice, to the position of foreman in 1968, and

to the position of supervisor in 1970. In 1986, FMI, a

wholly owned subsidiary of Echlin, Inc. ("Echlin") acquired

the assets of PT/BT. Thereafter, Wood continued working at

FMI as a production foreman without a break in service.

In February of 1987, Echlin, concerned about the

financial condition of the newly formed FMI, fired FMI's

president and manufacturing manager. Three days later,

Echlin appointed Patrick Healey to the top managerial

position at FMI, that of division manager. Under Healey's

leadership, FMI began to retool and update its manufacturing

processes.

-2-
2

As a result, Woods and the other three FMI

production foremen in the block-making department (Richard

Bond, a 45 year-old caucasian male, Paul Harris, a 65 year-

old African-American male, and Peter Lane, an 50 year-old

African-American male) experienced an increase in their

duties and responsibilities. According to Woods, FMI began

to expect more from its employees and the supervisor's

position became more complicated than it had been when he

worked at PT/BT. Deposition of J. Woods at 28. After the

reorganization began, of the four supervisors in the block-

making department, Bond was terminated for poor performance

and Lane was demoted to a non-supervisory position. Woods

initially fared well at FMI, as evidenced by a November 1987

written evaluation in which Superintendent Elvin Valentin

gave Woods an overall rating of three on a scale of one to

five. In 1988, however, Woods learned that Valentin's

opinion of his work had diminished. In a ten to fifteen

minute review, Valentin told Woods that both he and

manufacturing manager Ray Shaffer (Woods' direct supervisor)

felt that Woods was not performing up to his capability, that

he needed to improve his scheduling and interpersonal skills,

and that he would not be receiving a raise. Id. at 47-49.

In October 1988, Woods was injured in a non-work

related automobile accident. The resulting injuries forced

Woods to take an extended medical leave of absence from FMI.

-3-
3

By the end of February 1989, Woods had used all of his

medical and vacation leave time and still was unable to

return to work. Pursuant to FMI's policy of terminating all

employees who are unable to work after the expiration of

their leave time, notwithstanding the ongoing nature of the

ailment, FMI terminated Woods. Woods does not challenge his

termination.

By 1989, Woods was physically able to return to

work. In late 1989, FMI began interviewing candidates for

the position of production foreman for a new production line.

Woods, along with approximately seventy-four others, applied

for one of four available positions. Of the seventy-five

applicants, personnel manager Arthur McKew decided to

interview eight, including Woods. The eight applicants were

interviewed by two of FMI's production superintendents,

Warren Kappeler and Garnet Wilson1, who evaluated the

candidates on their manufacturing and production knowledge

and comprehension, supervisory skills, and general demeanor.

1. Wilson replaced Valentin who, in July 1989, was arrested
by the Massachusetts State Police and terminated from his
employment for theft of FMI funds. McKew aff. at 2. This is
only important because of Woods' allegation that Valentin
made racist remarks to Woods while they worked together.
Valentin, however, played no role in FMI's decision not to
hire Woods since he was no longer employed by the company
when the employment decisions were made. See Medina-Munoz v.

R.J. Reynolds Tobacco Co., 896 F.2d 5, 10 (1st Cir. 1990)

("The biases of one who neither makes nor influences the
challenged personnel decision are not probative in an
employment discrimination case.").

-4-
4

Both Kappeler and Wilson assessed Woods' supervisory skills

and understanding of production processes as weak and felt

that on balance these weaknesses outweighed Woods' years of

experience. Both men recommended that Woods not be hired.

McKew stated that he ultimately decided not to hire Woods

based upon the interviews and Woods' previous performance

evaluations. In his deposition, McKew conceded that although

Woods could have filled one of the open positions, he was not

hired because there were others who he found to be better

qualified. The positions were thereafter filled by four

younger, non-handicapped, caucasian males. Woods concedes

that he is unaware of the qualifications possessed by those

ultimately hired.

On March 19, 1990, Woods filed a complaint with the

Massachusetts Commission Against Discrimination ("MCAD"). On

May 7, 1990, Woods commenced this action by filing a

complaint in the Superior Court of Massachusetts for the

County of Middlesex. In his complaint, Woods charged FMI

with age discrimination in violation of the Federal Age

Discrimination and Employment Act ("ADEA"), 29 U.S.C. 621

et seq., and with age and/or race and/or color and/or

handicap discrimination in violation of Mass. Gen. L. ch.

151B and Mass. Gen. L. ch. 93 102 and 103.

After removing the action to the federal district

court in Massachusetts, FMI filed a motion for summary

-5-
5

judgment on all claims, claiming that Woods had not made out

a prima facie case of discrimination because he had not shown

that he was qualified for the position sought, and, in the

alternative, that FMI's decision not to hire Woods had been

made for nondiscriminatory reasons, i.e., those hired were

better qualified. Woods filed a motion in opposition. On

October 1, 1993, the district court issued a written order in

which it awarded summary judgment in FMI's favor, finding

that although Woods had established a prima facie case, he

had failed to allege sufficient facts to rebut FMI's

articulated nondiscriminatory reasons under both ADEA and

Mass. Gen. L. ch. 151B. The district court further held that

Woods' claim under Mass. Gen. L. ch. 93 was preempted by

Mass. Gen. L. ch. 151B. It is from this judgment that Woods

now appeals.

II.

STANDARD OF REVIEW

We review grants of summary judgment de novo, and,

like the district court, are obliged to review the facts in a

light most favorable to the non-moving party, drawing all

inferences in the non-moving party's favor. LeBlanc v. Great

Am. Ins. Co., 6 F.3d 836, 841 (1st Cir. 1993), cert. denied,

114 S. Ct. 1398 (1994). Summary judgment is appropriate when

"the pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits, if any,

-6-
6

show that there is no genuine issue as to any material fact

and that the moving party is entitled to a judgment as a

matter of law." Fed. R. Civ. P. 56(c). "`[T]he mere

existence of some alleged factual dispute between the parties

will not defeat an otherwise properly supported motion for

summary judgment; the requirement is that there be no genuine

issue of material fact.'" Medina-Munoz, 896 F.2d at 8

(emphasis in original) (quoting Anderson v. Liberty Lobby,

Inc., 477 U.S. 242, 247-248 (1986) (citations omitted)).

Moreover, summary judgment may be appropriate "`[e]ven in

cases where elusive concepts such as motive or intent are at

issue, . . . if the non-moving party rests merely upon

conclusory allegations, improbable inferences, and

unsupported speculation.'" Goldman v. First Nat'l Bank of

Boston, 985 F.2d 1113, 1116 (1st Cir. 1993) (quoting Medina-

Munoz, 896 F.2d at 8). Finally, Fed. R. Civ. P. 56(c)

"mandates the entry of summary judgment . . . upon motion

against a party who fails to make a showing sufficient to

establish the existence of an element essential to that

party's case, and on which that party will bear the burden of

proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317,

322-23 (1986). III.
III.

DISCUSSION

On appeal, Woods claims, inter alia, that the

district court misapplied the respective burdens of the

-7-
7

parties under both federal and state law. More specifically,

Woods argues that the district court erred in ruling that the

burden shifting framework as limned in McDonnell Douglas

Corp. v. Green, 411 U.S. 792, 802-05 (1973) and expounded in

St. Mary's Honor Center v. Hicks, 113 S. Ct. 2742 (1993) (1)

may require plaintiff to present more than a prima facie case

in order to survive a motion for summary judgment, (2)

requires the employer to do no more than simply articulate a

nondiscriminatory reason for its employment action, and (3)

requires plaintiff to present evidence to show not only that

the employer's proffered reason was a pretext, but that it

was a pretext for illegal discrimination. Moreover, Woods

claims that the district court erred in analyzing both the

federal and state claims together under the same federal

standard and further erred in finding that Woods claims under

Mass. Gen. L. 93 102 and 103 were preempted. We address

each argument in turn.

A. Federal Claim

In an ADEA failure to hire discrimination suit,

plaintiff bears the ultimate burden of persuading the

factfinder that the employer illegally discriminated against

plaintiff by refusing to hire plaintiff on the basis of

his/her age. See Lawrence v. Northrop Corp., 980 F.2d 66, 69

(1st Cir. 1992). Where there is little direct evidence of

age discrimination, plaintiff may rely upon the three stage

-8-
8

burden-shifting framework set forth in McDonnell Douglas.

See id. at 68; Goldman, 985 F.2d at 1117. Under this

framework, plaintiff initially must establish a prima facie

case of discrimination, i.e., in a failure to hire situation,

plaintiff must show that (1) s/he is a member of a protected

class, (2) s/he applied and was qualified for the position in

question, (3) that despite his/her qualifications, s/he was

rejected, and (4) that, after rejection, the position

remained open and the employer continued to seek applicants

from persons of the complainant's qualifications. See

McDonnell Douglas, 411 U.S. at 802. Once plaintiff

successfully establishes a prima facie case, it is presumed

that the employer engaged in impermissible age

discrimination. See Texas Dept. of Community Affairs v.

Burdine, 450 U.S. 248, 254 (1981).

In the second stage, the employer must rebut this

presumption by articulating a legitimate, non-discriminatory

reason for its decision not to hire plaintiff. See Vega v.

Kodak Caribbean, Ltd., 3 F.3d 476, 479 (1st Cir. 1993). "The

employer's burden at this stage is merely one of production;

the burden of persuasion remains plaintiff's at all times."

Lawrence, 980 F.2d at 69. Once a legitimate

nondiscriminatory reason is articulated, the presumption

created by plaintiff's prima facie case disappears. Id. At

the third and final stage, plaintiff must produce sufficient

-9-
9

evidence, direct or indirect, to show that the reasons

advanced by the employer constitute a mere pretext for

unlawful discrimination. See LeBlanc, 6 F.3d at 842. To

meet this burden, the claimant must prove both that the

employer's articulated reason is false, and that

discrimination was the actual reason for its employment

action. See Hicks, 113 S. Ct. at 2749 n.4.2 If plaintiff

"fails to show `pretext,' [for discrimination] the challenged

employment action `must stand.'" Id. at 2752 n.6 (quoting

McDonnell Douglas, 411 U.S. at 807).

Of course, the framework described above applies to

a full bench trial, as was the case in Hicks. As we noted in

2. Woods misstates the law when he argues without citing any
authority that "[i]f the plaintiff shows that an employer's
reasons are not credible, he resurrects the presumption of
unlawful discrimination, since in the absence of any known
reasons for the employers decision, courts presume that the
employer was motivated by discriminatory reasons." In Hicks,

the Court addressed this precise issue and held that once the
defendant

has succeeded in carrying its burden of
production, the McDonnell Douglas

framework -- with its presumptions and
burdens -- is no longer relevant. To
resurrect it later, after the trier of
fact has determined that what was
`produced' to meet the burden of
production is not credible, flies in the
face of our holding in Burdine that to

rebut the presumption `[t]he defendant
need not persuade the court that it was
actually motivated by the proffered
reasons.'

Hicks, 113 S. Ct. at 2749 (quoting Burdine, 450 U.S. at 254).

-10-
10

LeBlanc, however, the Hicks decision set forth the respective

burdens which need to be met in order for a party to survive

a motion for summary judgment:

In the context of a summary judgment
proceeding, Hicks requires that, once the

employer has advanced a legitimate,
nondiscriminatory basis for its adverse
employment decision, the plaintiff,
before becoming entitled to bring the
case before the trier of fact, must show
evidence sufficient for the factfinder
reasonably to conclude that the
employer's decision to discharge him or
her was wrongfully based on age.
Goldman, 985 F.2d at 1117; Lawrence, 980

F.2d at 69-70; Villanueva [v. Wellesley

College], 930 F.2d [124,] 127-28 [(1st

Cir.), cert. denied, 112 S. Ct. 181

(1991)]; Connell [v. Bank of Boston], 924

F.2d [1169,] 1172 [(1st Cir.), cert.

denied, 501 U.S. 1218 (1991)]. "Direct

or indirect evidence of discriminatory
motive may do, but `the evidence as a
whole . . . must be sufficient for a
reasonable factfinder to infer that the
employer's decision was motivated by age
animus.'" Goldman, 985 F.2d at 1117

(quoting Connell, 924 F.2d 1172 n.3).

Thus, the plaintiff cannot avert summary
judgment if the record is devoid of
adequate direct or circumstantial
evidence of discriminatory animus on the
part of the employer. See id. at 1118

(citations and footnote omitted).

LeBlanc, 6 F.3d at 843.3

3. In its amicus curiae brief, the Equal Employment
Opportunity Commission (the "EEOC"), urges us to hold that
"an employment discrimination plaintiff may survive summary
judgment by establishing a prima facie case of discrimination
and showing a genuine issue of fact on the question of
whether the employer's asserted explanation for its actions
is worthy of credence." In other words, the EEOC would like
a blanket statement that once evidence of pretext is
proffered, that evidence along with the prima facie case will

-11-
11

1. Stage One - Woods' Prima Facie Case

We agree that Woods has provided sufficient

evidence to establish a prima facie case. As the district

court stated, Woods has shown that

[h]e is a member of [the] protected
class[] . . . within the meaning of
applicable law. His long experience in
the industry and history of largely
favorable reviews, and McKew's opinion
that he was qualified to fill one of the

at all times shield plaintiff from adverse summary judgments.
The EEOC cites as authority the following passage from Hicks,

in which the Court specifically noted that

[t]he factfinder's disbelief of the
reasons put forward by the defendant
(particularly if disbelief is accompanied
by a suspicion of mendacity) may,

together with the elements of the prima
facie case, suffice to show intentional
discrimination.

Hicks, 113 S. Ct at 2749 (emphasis supplied). We do not

agree that the Court's language supports the EEOC's position.
Rather, this quoted statement simply makes clear that the
Supreme Court envisioned that some cases exist where a prima
facie case and the disbelief of a pretext could provide a

strong enough inference of actual discrimination to permit
the fact-finder to find for the plaintiff. Conversely, we do
not think that the Supreme Court meant to say that such a
finding would always be permissible. (For example, suppose

an employee made out a truly bare-bones prima facie case of
age discrimination, and the employer responded that the
employee lacked the necessary skills for the job. Suppose
also that unrefuted evidence showed that the response was a
pretext, because the employer had fired the employee to
conceal the employer's own acts of embezzlement. In such an
instance, there would be a prima facie case at the outset and
a disbelieved pretext, but we think it plain that no
reasonable jury could find age discrimination on such a
record.) The strength of the prima facie case and the
significance of the disbelieved pretext will vary from case
to case depending on the circumstances. In short, everything
depends on the individual facts.

-12-
12

openings, has created at least a genuine
issue as to his ability to meet the
employer's legitimate expectations.
Woods was denied a supervisory position
by FMI. In addition, [FMI] has not
offered evidence to remove from dispute
the issue whether he is about as
qualified as the individuals ultimately
hired.

Therefore, we turn our attention to the question of whether

FMI has satisfied its burden of production by articulating a

legitimate non-discriminatory reason for refusing to hire

Woods.

2. Stage Two - FMI's Articulated Nondiscriminatory

Reason

FMI offers two interrelated reasons for not hiring

Woods. Basically, FMI contends that Woods was not qualified

to hold a supervisory position in the new and retooled FMI,

and that in the alternative, even if he was found to be

minimally qualified, that he was not as qualified as those

ultimately hired. In support of these claims, FMI introduced

the affidavits of Healey, McKew, Wilson, and Kappeler. In

his statement, Healey recounted the changes he implemented to

make FMI financially competitive in the market and why Woods'

prior experience was not indicative of his ability to

competently fill the updated position of productions foreman.

Among the changes, he noted that the production foremen in

particular were given more responsibility while losing some

of their support systems and that "[i]n essence, FMI went

-13-
13

from a relatively simple operation to a complex manufacturing

system with a production schedule and pre-planning

requirements." Affidavit of P. Healey at 8. Healey stated

that Woods "had a limited technical knowledge of how brake

parts were manufactured . . . . a limited ability to trouble

shoot and generally displayed limited inclination and ability

to be innovative." Id. at 5. Healey further opined that

Woods lacked "basic supervisory skills, including the ability

to plan work, to organize and to implement a production plan,

and to motivate employees to carry out the plan," id., and

that he "had a great deal of difficulty in planning for and

implementing the coordination of the machinery, raw material

and workforce assignments necessary to produce the product

mix and quantity required of his shift," id. at 9. Attached

to Healey's affidavit is a copy of an undated and unsigned

evaluation, one which was never shared with Woods because of

his accident and subsequent inability to return to work. In

the evaluation, both Healey and Shaffer rated Woods' overall

performance in the second to lowest category, while awarding

Woods the lowest grade with regard to enforcement of company

policies, acceptance of responsibility, and decision-making.

Healey stated that as a result of this evaluation, management

intended to place Woods on probationary status prior to his

accident.

-14-
14

Kappeler and Wilson stated in their affidavits that

based upon their interviews, they found Woods to be an

unacceptable candidate for a foreman position with FMI

because of his weak supervisory skills and lack of

understanding of production processes, such as sequencing and

planning. Both men rated Woods as having the poorest

supervisory skills of all those interviewed. Affidavit of W.

Kappeler at 2; Affidavit of G. Wilson at 1. As noted

earlier, McKew also stated that those hired were more

qualified. Thus, we find that FMI successfully articulated

non-discriminatory reasons for not hiring Woods, and

therefore carried its burden of production.

3. Stage Three - Pretext for Discrimination

Finally, we must determine whether Woods has

produced sufficient evidence to raise a genuine issue of

material fact such as would permit a reasonable factfinder to

conclude that FMI did not rely on its articulated reasons in

deciding not to hire Woods and that FMI unlawfully

discriminated against Woods because of his age. Of course,

the most obvious and relevant piece of evidence Woods could

introduce to contradict FMI's assertion that he was not the

best qualified for the position, would be evidence regarding

the qualifications of those hired. Woods, however, has

neither introduced their respective resumes, nor argued to us

that he was unable to obtain this information through the

-15-
15

normal discovery channels. In fact, the only evidence

produced by Woods to show that the other candidates were not

more qualified appears in his own deposition where he

concludes, after admitting that he had no knowledge of the

qualifications of those hired, that he had twenty years of

experience in the brake manufacturing industry while the

other applicants had none. Woods contends that on this basis

alone, a reasonable juror might infer that Woods was as

qualified or more qualified than those who were hired.

Furthermore, he contends that it would be reasonable for a

juror to infer, on the basis of this evidence coupled with

his prima facie case that the actual reason for FMI's

decision not to hire Woods was because he was too old. We do

not agree. Although Woods has presented enough evidence

to permit a reasonable factfinder to determine that he was

qualified to hold one of the four positions on the basis of

1) his experience, 2) the favorable evaluations and

promotions Woods received prior to his accident, and 3)

McKew's reluctant admission that Woods was minimally

qualified to hold one of the four positions, there is no

evidence either to rebut FMI's assertion that those hired

were more qualified, or to suggest that FMI's decision not to

hire Woods was in any way driven by illegal age animus.

Because Woods has failed to present sufficient evidence to

permit a reasonable factfinder to infer that FMI's

-16-
16

articulated reason was a pretext for unlawful age

discrimination, his claim under ADEA must fail.

B. State Law Claims

1. Mass. Gen. L. ch. 151B

Next, Woods claims that although Mass. Gen. L. ch.

151B4

employment discrimination claims are generally analyzed

according to the federal burden shifting regime articulated

4. Mass. Gen. L. ch. 151B 4 provides in relevant part:

It shall be an unlawful practice:

1. For an employer, by himself or his agent,
because of the race, color, . . . to refuse to hire or employ
or to bar or to discharge from employment such individual or
to discriminate against such individual in compensation or in
terms, conditions or privileges of employment, unless based
upon a bona fide occupational qualification.
. . . .
1B. For an employer in the private sector, by
himself or his agent, because of the age of any individual,
to refuse to hire or employ or to bar or to discharge from
employment such individual, or to discriminate against such
individual in compensation or in terms, conditions or
privileges of employment, unless based upon a bona fide
occupational qualification.
. . . .
16. For any employer, personally or through an
agent, to dismiss from employment or refuse to hire, rehire
or advance in employment or otherwise discriminate against,
because of his handicap, any person alleging to be a
qualified handicapped person, capable of performing the
essential functions of the position involved with reasonable
accommodation, unless the employer can demonstrate that the
accommodation required to be made to the physical or mental
limitations of the person would impose an undue hardship to
the employer's business.

Mass. Gen. Laws Ann. ch. 151B 4 et seq., (West 1982 & Supp.
1994).

-17-
17

in McDonnell Douglas, the Massachusetts Supreme Judicial

Court (the "SJC"), has placed a more demanding burden upon

the employer than the burden imposed by federal law as

interpreted by this circuit. Thus, Woods argues that it was

error for the district court to lump the federal and state

claims together, and that under the proper standard, FMI's

motion for summary judgment must fail.

It is well established "that the `state courts are

the ultimate expositors of state law' and the federal courts

are bound by the constructions placed upon state statutes by

state courts absent extreme circumstances." Rundlett v.

Oliver, 607 F.2d 495, 500 (1st Cir. 1979) (quoting Mullaney

v. Wilbur, 421 U.S. 684, 691 (1975)). Moreover, it is

equally well established that when interpreting Massachusetts

discrimination statutes, the SJC "may look to the

interpretations of analogous federal statutes, but are not

bound thereby." August v. Offices Unlimited, Inc., 981 F.2d

576, 580 n.3 (1st Cir. 1992).

While the SJC has used the three-part McDonnell

Douglas analysis as a guide in deciding claims under Mass.

Gen. L. ch. 151B, it has been somewhat more severe in its

treatment of defendants. In the oft-cited Wheelock College

v. Massachusetts Comm'n. Against Discrimination, 355 N.E.2d

309 (Mass. 1976), the SJC acknowledged that McDonnell-Douglas

merely required the employer to articulate a legitimate non-

-18-
18

discriminatory reason for its action; but the court went on

to say under ch. 151B, "that articulating a reason in cases

of this kind requires the employer to produce not only

evidence of the reason for its action but also underlying

facts in support of that reason." Id. at 313-14. Other

Massachusetts cases follow the same course.5

All this, however, is academic in the present case

because even under the more demanding standard apparently

followed in Massachusetts, FMI has done more than merely

articulate a reason. It has offered three affidavits in

which those concerned set forth their assessment that Woods

was not as well qualified as the four men ultimately hired;

there is a contemporaneous evaluation of Woods critical of

his skills that would presumably be admissible as a business

record; and there is an explanation from one of the affiants

that colorably explains how Woods could have done an adequate

job for a number of years without being especially well

qualified for the more demanding tasks contemplated by the

new position in the upgraded company. Whether or not these

5. See, e.g., McKenzie v. Brigham and Women's Hosp., 541

N.E.2d 325, 326 (Mass. 1989) (defendant must "advanc[e]
lawful grounds for the action taken and produce evidence of

underlying facts in support thereof") (emphasis added);
Trustees of Forbes Library v. Labor Relations Comm'n, 428

N.E.2d 124, 128 (Mass. 1981) (employer could not say merely
that employee was fired for breaking rules, but also "would
have to identify the rules and perhaps the occasions of their
violation, and offer some indication that it had considered
these violations in its deliberations prior to the
discharge").

-19-
19

materials taken together are a substantial case for the

company--the case would be a stronger one if more had been

said about the qualifications of the four men hired instead

of Woods--the materials certainly amount to some evidence in

support of the articulated reason.

Finally, it does not matter in the present case

whether Massachusetts turns out to follow Hicks as construed

by the EEOC rather than as we have construed it. Whatever

weight a disbelieved reason may have in supporting an

inference of discriminatory intent, Woods has not created "a

genuine issue of fact on the question of whether the

employer's asserted explanation for its actions is worthy of

credence." See p. 11, n.3, supra. The jury might conclude

that Woods was at least minimally qualified based on his past

record, but there is no evidence that the employer's asserted

explanation--that it found four other men better qualified--

is pretextual.

2. Mass. Gen. L. ch. 93 102 and 103.

Lastly, Woods claims that the district court erred

in finding that his Mass. Gen. L. ch. 93 102 and 103

claims were preempted by Mass. Gen. L. ch. 151B. Woods'

argument, however, is not supported in the caselaw. See

Martin v. Envelope Div. of Westvaco Corp., No. CIV. A. 92-

30121-MAP, 1994 WL 162354, at *11 (D. Mass. Apr. 29, 1994)

(collecting federal and state court cases holding that Mass.

-20-
20

Gen. L. ch. 151B provides the exclusive remedy in

Massachusetts for employment related discrimination claims);

see also DeFazio v. Delta Air Lines, Inc., 849 F. Supp. 98,

103 (D. Mass. 1994) (holding that the reasoning of state and

federal cases which find Mass. Gen. L. ch. 93 102

employment discrimination claims to be preempted by Mass.

Gen. L. ch. 151B "applies with equal force to [employment

discrimination] claims under Chapter 93, 103").

In sum, we agree with the district court that

the adequacy of the remedies afforded
under Mass. Gen. L. ch. 151B, the
efficiency of a uniform legislative
remedy, the importance of giving effect
to the procedural prerequisites of Mass.
Gen. L. ch. 151B, and the absence of
clear guidance from the Massachusetts
Supreme Judicial Court, all support the
finding that Mass. Gen. L. ch. 151B is
the exclusive state law remedy for
employment discrimination complaints.

Woods v. Friction Materials, Inc., 836 F. Supp. 899, 908 (D.

Mass. 1993) (citing Bergeson v. Franchi, 783 F. Supp. 713 (D.

Mass. 1992)).

III.

CONCLUSION

For the foregoing reasons, the order of the

district court granting summary judgment in favor of

defendant FMI is Affirmed.

-21-
21